REDACTED VERSION
SUBJECT TO MOTION TO SEAL

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| BNY AIS NOMINEES LIMITED, GOTTEX ABL (CAYMAN) LIMITED GOTTEX MATRIX ASSET FOCUSED MASTER FUND LIMITED, GOTTEX/NOMURA MARKET NEUTRAL FUND (USD) LIMITED, GOTTEX ABI MASTER FUND LIMITED, and HUDSON ABL FUND LIMITED,<br><br>Plaintiffs,<br><br>v.<br><br>MARLON QUAN, and STEWARDSHIP INVESTMENT ADVISORS, LLC,<br><br>Defendants. | C.A. No. 3:08-cv-00796-AWT |

### DECLARATION OF J.P. BAILEY IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR EXPEDITED DISCOVERY AND A TEMPORARY PRELIMINARY INJUNCTION

J.P. BAILEY, makes the following declaration, pursuant to 28 U.S.C. § 1746:

1. I make this declaration in support of Plaintiffs BNY AIS Nominees Limited ("BNY") and Gottex ABL (Cayman) Ltd., Gottex Matrix Asset Focused Master Fund Ltd., Gottex/Nomura Market Neutral Fund (USD) Ltd., Gottex ABI Master Fund Ltd., and Hudson ABL Fund Ltd.'s (the "Gottex Funds") (collectively with BNY, "Plaintiffs") Emergency Motion for Expedited Discovery and a Temporary Preliminary Injunction.

2. I am the Senior Investment Partner for the investment manager to the Gottex Funds, Gottex Fund Management Sarl ("Gottex"). I have worked for Gottex since 1998. I was one of the original founding partners of the fund of funds business at Gottex. I have extensive experience in a wide variety of hedge fund strategies, including but not limited to convertible arbitrage, merger arbitrage, and asset-based lending strategies.

REDACTED VERSION
SUBJECT TO MOTION TO SEAL

3.  In my capacity as Senior Investment Partner for Gottex, I have investment authority with respect to the Gottex Funds. I am therefore familiar with the details of the Gottex Funds' investments, including their investments in the Stewardship Credit Arbitrage Fund, Ltd. (the "Hedge Fund"), which is managed by Defendants Marlon Quan ("Quan") and Stewardship Investment Advisors, LLC ("Stewardship") (collectively, "Defendants"). Based on my activities in connection with the Gottex Funds, and my review of pertinent business records and other documents listed below, I have personal knowledge of the following facts.

**The Gottex Funds**

4.  The Gottex Funds are "funds of funds." In other words, each of the Gottex Funds is a fund that invests in hedge funds. The investors in each of the Gottex Funds vary, but the majority are institutional investors such as government, corporate and Taft-Hartley pension plans, insurance companies, corporations, endowments, foundations, and banks. The Gottex Funds' investment manager, Gottex Fund Management Sarl ("Gottex"), seeks to invest in strategies for the Gottex Funds that, among other things, maximize returns for their investors with relatively low risk and low correlation to more traditional assets available to investors. In order to implement these strategies, Gottex carefully selects hedge funds in which to invest that meet these criteria. Among the strategies that the Gottex Funds pursue are asset-based lending ("ABL") strategies. ABL strategies seek to, among other things, invest in privately originated loans to companies, special purpose vehicles, or individuals, which are secured by an investment in a specific asset or pool of assets. Because ABL strategies are a focus of the Gottex Funds, investment professionals at Gottex have studied and are familiar with the market for ABL strategies and the hedge fund managers that focus on ABL strategies.

5.  Among ABL hedge fund managers with whom the Gottex Funds considered investing was defendant Stewardship, an investment advisory company led at all times by defendant Quan. Quan founded the Hedge Fund, which has always been managed by Stewardship under Quan's direction. Quan and Stewardship make the investment decisions of the Hedge Fund and manage the assets of the Hedge Fund.

REDACTED VERSION
SUBJECT TO MOTION TO SEAL

6.  The principal investment objective of the Hedge Fund, according to Defendants' descriptions, was to invest in short-term notes collateralized by inventory, equipment, purchase orders, and accounts receivable of U.S. businesses. In other words, the Hedge Fund purchased notes, or loans, that were used to finance the purchase of non-perishable consumer merchandise inventory. Basically, inventory brokers purchased merchandise (such as consumer electronics) at distressed prices due to excess inventory arising out of retail bankruptcies, excess capacity, or wholesale overruns. The merchandise was then pre-sold to retailers with an "A" credit rating or better, such as Costco or Sam's Club.

7.  One of the primary advantages of this strategy is the relatively short duration of the loans – typically the average maturity of the loans was only about 90 days from the time that the inventory broker picked up the merchandise to the time they were paid for the merchandise. At the conclusion of that period, the Hedge Fund would receive cash for those loans. Thus, this strategy created a steady cash flow into the Hedge Fund. Although not bound to do so, Defendants represented that they typically reinvested, or "rolled over," the cash received into new loans of similar maturity with the same inventory broker. I and others at Gottex were familiar with the inventory broker that Defendants used to implement this strategy for the Hedge Fund because it is an inventory broker that several other ABL hedge funds use, including at least one other hedge fund in which some of the Gottex Funds had invested. The financing company used by the Hedge Fund to lend money to the broker is called Acorn Capital Group, LLC ("Acorn"). Acorn is also owned and controlled by defendant Quan.

**The Hedge Fund**

8.  Quan is the Managing Director of the Hedge Fund, a mutual fund company incorporated on May 14, 2001 in Bermuda. As the Managing Director of the Hedge Fund, Quan supervises and administers all of the business of the Hedge Fund. The Hedge Fund has four classes of shares, including the Class A shares in which the Gottex Funds invested. The Hedge Fund represents to investors that it invests primarily in short-term debt used to finance the purchase of non-perishable consumer merchandise inventory from inventory brokers.

REDACTED VERSION
SUBJECT TO MOTION TO SEAL

9. Quan also founded and is the Managing Member of defendant Stewardship, the Hedge Fund's investment manager. According to the Hedge Fund's Confidential Private Placement Memorandum, Stewardship, under Quan's direction, makes all investment decisions on behalf of the Hedge Fund.

10. The Hedge Fund is governed by Bye-laws that the Hedge Fund's Board of Directors adopted on or around May 16, 2001 ("Bye-laws"). A true and accurate copy of the Bye-laws is attached hereto as Exhibit 1.

**The Gottex Funds' Initial Investment in the Hedge Fund**

11. After at least two earlier meetings in 2001 and 2003, I met with Quan and other Stewardship representatives in May 2005 at Quan's Connecticut office on behalf of the Gottex Funds to discuss investing in the Hedge Fund. Following this meeting, the Gottex Funds conducted due diligence on the Hedge Fund, which included a series of meetings with Quan and other Stewardship employees in June 2005. In connection with this process, the Gottex Funds reviewed the Hedge Fund's Confidential Private Placement Memorandum dated July 1, 2005 (the "Private Placement Memorandum"), among other documents, which Defendants provided to the Gottex Funds. A true and correct copy of the July 1, 2005 Private Placement Memorandum is attached as Exhibit 2. The Private Placement Memorandum was amended once in 2007, but the relevant provisions remained materially unchanged.

12. During the due diligence period and the months in which Plaintiffs were shareholders in the Hedge Fund, we obtained information concerning the assets of the Hedge Fund directly from Stewardship and Quan. We reviewed business records concerning the Hedge Fund's assets and holdings in Defendants' Connecticut office. In addition, Stewardship sent us letters concerning the financial state of the Hedge Fund.

13. Specifically, we reviewed the provisions in the Private Placement Memorandum which includes an explanation of the rights of the shareholders, including among other things, a shareholder's right to redeem, or cash in, its shares. Those provisions of the Private Placement Memorandum state, among other things, that the Hedge Fund is required to honor a

REDACTED VERSION
SUBJECT TO MOTION TO SEAL

shareholder's request to redeem its shares: "Class A Shareholders may *require* the Fund to redeem all or some of their Class A Shares on at least 90 days' prior written notice ('Redemption Request') on the last Business day of each calendar month [the 'Redemption Date']." *See* Exhibit 2 at 6.

14. Once a shareholder has made a redemption request, the Hedge Fund is required to pay to the shareholder the Redemption Price (as defined in the Private Placement Memorandum and the Hedge Fund's Bye-laws). The Hedge Fund may settle a redemption request by paying cash or by an "in-kind" distribution to the redeeming shareholder of "assets of the [Hedge Fund]" as of the Redemption Date which are securities that have a value equal to the Redemption Price. *See* Exhibit 1 at § 15.1(a). Although the Hedge Fund has the discretion to settle a redemption request with cash or a valid in-kind distribution, the Private Placement Memorandum states that the Hedge Fund "*intends* to pay redemptions in cash." *See* Exhibit 2 at 20 (emphasis added). Indeed, the Private Placement Memorandum states that redemptions of Class A shares in cash could occur even where it might have a detrimental effect on the Hedge Fund: "Depending on market conditions, the size of the Fund's positions, and the number of Redemption Requests received, *redemptions of Class A Shares could cause the Fund to liquidate positions more rapidly than would otherwise be desirable or to satisfy redemption requests with cash . . . .*" *See* Exhibit 2 at 21 (emphasis added).

15. Investing in the Hedge Fund was attractive to the Gottex Funds because, among other reasons, Quan and Stewardship represented to us that the majority of the holdings of the Hedge Fund consisted in large part of highly-liquid, short-term debt instruments with an average maturity of approximately 90 days until the debt is converted to cash.

16. In reliance upon, among other things, the provisions of the Private Placement Memorandum regarding a shareholder's right to redeem its shares in the Hedge Fund, which provide that a redeeming shareholder will promptly receive either cash or qualifying assets in kind, the stated intention of the Hedge Fund to pay redemptions in cash, and the statement that redemptions may lead to the liquidation of assets more rapidly than otherwise desirable in order

REDACTED VERSION
SUBJECT TO MOTION TO SEAL

to satisfy redemption requests in cash; Defendants' representations concerning the highly-liquid, short-term nature of the Hedge Fund's investments; and the fact that hedge funds customarily redeem shares in cash, the Gottex Funds elected to purchase Class A shares of the Hedge Fund beginning in October 2005. The Gottex Funds continued to purchase additional Class A shares in the Hedge Fund through March 2007, ultimately acquiring shares worth more than $100 million.

**Management Fee Agreement**

17. In June 2006, the Gottex Funds became dissatisfied with the Hedge Fund's returns, which we believed to be low compared to other opportunities in the sector at the time and particularly unsatisfactory in light of the high total fees being paid to Defendants.

18. As a result, in the summer of 2006, I met with Quan in New York City to express our dissatisfaction with the Hedge Fund's performance. I told Quan that the Gottex Funds were unsatisfied with the returns that the Hedge Fund was yielding, and that the Gottex Funds could find more favorable investment opportunities and terms elsewhere. In response, Quan told me that he could boost returns through the use of leverage. I rejected this proposal because it created an unacceptable risk to the Gottex Funds' capital.

19. On or around June 26, 2006, the Gottex Funds and Quan entered into an agreement (the "Management Fee Agreement") whereby Stewardship, effective June 30, 2006, would lower its management fee of 1.75% by 50 basis points if the Gottex Funds' returns fell below a certain level (i.e., 10.5%). We further agreed that if the Gottex Funds' returns were between 10% and 10.5%, Stewardship would be able to recapture the 50 basis points it forfeited on its management fee. Additionally, we agreed that if the returns exceed 10.5% Stewardship could collect its management fee according to the original fee schedule. Quan told me that he would memorialize the Management Fee Agreement in writing soon after we reached this agreement.

REDACTED VERSION
SUBJECT TO MOTION TO SEAL

20. In reliance on Quan's agreement to the Management Fee Agreement and his representation that he would memorialize the Management Fee Agreement in writing, we chose to keep the Gottex Funds invested in the Hedge Fund and purchased additional Class A shares in the Hedge Fund.

21. In the months following this agreement, Gottex spoke with Quan on at least one occasion and asked him to follow through on memorializing the terms of the Management Fee Agreement in writing. Quan responded that he would, as promised, put together a draft of the Management Fee Agreement in writing. For this entire time, Defendants collected a management fee of 1.75% despite the fact that Hedge Fund's returns were below 10.5%.

22. Finally, on or about February 1, 2007, Quan, contrary to the terms of the Management Fee Agreement, told me that Defendants refused to honor the terms of the Management Fee Agreement by asserting instead that the effective date of the Management Fee Agreement would be March 1, 2007 instead of June 30, 2006 as the parties had agreed.

23. As a result of Quan's refusal to honor the terms of the Management Fee Agreement, among other reasons, I notified Quan that the Gottex Funds intended to serve redemption requests to retrieve their investment interest in the Hedge Fund. To that end, the Gottex Funds submitted redemption requests to the Hedge Fund in May and July 2007 for the full value of their interests. These redemption requests called for Redemption Dates of August 31, 2007 and October 31, 2007.

**Redemption Deferral Agreement**

24. In August 2007, Quan contacted me and asked if the Gottex Funds would agree to defer their Redemption Dates of August 31, 2007 and October 31, 2007 to a later date. Quan told me that he wanted time to raise cash by attracting new investors in the Hedge Fund so that such cash could be used to pay the Gottex Funds' redemptions. Quan said he wanted more time because the market environment at that time was not conducive to raising new investor capital. Quan's request and representations concerning the reasons for the request only made sense if he

REDACTED VERSION
SUBJECT TO MOTION TO SEAL

was going to cause the Hedge Fund to pay the redemptions in cash. Quan also agreed to cause the Hedge Fund to waive any redemption penalty fees against the Gottex Funds if we agreed to postpone certain of the redemptions.

25.     Based upon (i) the stated intention in the Private Placement Memorandum that the Hedge Fund intended to pay redemptions in cash, (ii) ordinary business practices of the hedge fund industry to satisfy redemptions in cash, (iii) Defendants' representations that a meaningful proportion of the Hedge Fund consisted of substantial, highly liquid assets, and (iv) Defendants' statements to me that the Hedge Fund wanted time to attract new investors to generate funds to pay the Gottex Funds' redemptions in cash, we reasonably believed that Defendants intended to cause the Hedge Fund to pay the Gottex Funds' redemptions in cash and agreed to a redemption deferral agreement.

26.     Specifically, we reached an agreement with Quan to defer the Gottex Funds' August 31, 2007 and October 31, 2007 Redemption Dates to March 31, 2008, to waive any penalty on those redemptions, and to accelerate without penalty the Gottex Funds' remaining Redemption Dates to March 31, 2008, at which time Defendants would have until May 12, 2008 to cause the Hedge Fund to pay the Gottex Funds 90% of the proceeds of their redemptions, with the balance to be paid within 10 days following final determination of the net asset value of the Hedge Fund as of March 31, 2008 (the "Redemption Deferral Agreement"). In accordance with the terms of the Redemption Deferral Agreement, the Gottex Funds cancelled their earlier redemption requests and submitted new redemption requests for a full redemption of their Class A shares as of a Redemption Date of March 31, 2008. Pursuant to this agreement, the first payment to the Gottex Funds of at least 90% of their redemption proceeds was due on May 12, 2008. Defendants never objected to the form of our redemption requests.

27.     Despite Defendants' representations and assurances, Defendants failed to cause the Hedge Fund to properly redeem the Gottex Funds at all, let alone in cash. On repeated occasions during the period August 2007 to early March 2008, I and other Gottex representatives inquired of Defendants as to whether Defendants were taking actions so as to be ready for the

REDACTED VERSION
SUBJECT TO MOTION TO SEAL

agreed-upon March 31 Redemption Date and in reply Quan told me that they would be ready to meet the Gottex Funds' Redemption Date of March 31, 2008.

28. Beginning in mid-March 2008, I and other Gottex Funds' representatives made repeated attempts to contact Quan by telephone and e-mail to discuss Defendants' readiness to pay the Gottex Funds' redemptions by the May 12, 2008 due date for the first payment. Quan did not return these telephone calls or e-mails until March 27, 2008.

29. On March 27, 2008, almost nine months after the Gottex Funds submitted their original Redemption Requests, Quan told me for the first time that Stewardship might have some difficulty settling the Gottex Funds' redemption requests in cash.

30. A few days later, on April 1, 2008, Quan called us and notified us for the first time that Defendants would be paying the Gottex Funds' redemptions in-kind. Quan did not state at that time how the Defendants planned to make the in-kind payment. Quan stated that the decision to pay the Gottex Funds' redemption requests with an in-kind distribution was to avoid any lag in performance returns resulting from holding cash in the Hedge Fund, and not due to any issue of illiquidity. Quan also admitted and conceded that he had known for some time that he did not plan to pay the Gottex Funds' redemptions in cash.

31. Although many hedge funds retain discretion to settle redemption requests "in kind" instead of in cash, such discretion is rarely exercised in the hedge fund industry. In my experience within the hedge fund industry, hedge funds – particularly those holding the type of short-term, highly-liquid assets that the Hedge Fund purportedly holds –based on representations made by Defendants in due diligence meetings and investor letters – customarily pay shareholders' redemptions in cash. Typically, hedge funds only settle redemptions with an in-kind distribution when they are absolutely unable to pay the redemption in cash because, for example, the hedge fund's assets are illiquid. It would be highly unusual for a hedge fund to pay a shareholder its redemption with an in-kind distribution when it has the ability to make such a payment in cash. Further, on the rare occasion when a hedge fund settles a redemption with an

REDACTED VERSION
SUBJECT TO MOTION TO SEAL

in-kind distribution to a shareholder, the value of the in-kind distribution equals the value actually owed.

32.  In fact, some of the Gottex Funds had invested in another hedge fund, Arrowhead Capital Finance Ltd. ("Arrowhead"), which held roughly 85% of its assets in the same short-term debt (used to finance the purchase of non-perishable consumer merchandise inventory from inventory brokers) that purportedly comprised the majority of the Hedge Fund's assets. Arrowhead obtained the short-term debt from the same inventory broker that Quan used for the Hedge Fund. When the Gottex Funds submitted redemption requests to Arrowhead in December 2006, Arrowhead – consistent with the hedge fund industry practice – paid 90% of the value of the Gottex Fund's redemptions in cash within 90 days.

33.  Defendants had always represented to me that a meaningful proportion of the Hedge Fund's holdings were in the notes of maturities of roughly 90 days. These 90-day notes create a steady cash flow into the Hedge Fund that Defendants could have used to pay the Gottex Funds' redemptions in cash. **REDACTED**

A true and correct copy of the Hedge Fund's Audited Financial Statement for the year ended December 31, 2007 is attached hereto as Exhibit 3. As a result, there should have been little or no need for the Hedge Fund to liquidate assets to satisfy the Redemption Requests or to obtain new finance through new investors; rather, Defendants could have caused the Hedge Fund to hold the cash received as existing notes came to maturity to satisfy the Redemption Requests rather than reinvest that cash into new notes. But even if Defendants had needed to liquidate assets of the Hedge Fund, by March 2008, Defendants had many months advance notice and adequate time to liquidate assets in the Hedge Fund necessary in order to pay the Gottex Funds' redemptions in cash.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 26, 2008.

_____
J.P. Bailey

LIBA/1905597.1

11